UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| CYNTHIA ESPINOSA,<br>    Plaintiff<br><br>VS.<br><br>HARLINGEN CONSOLIDATED<br>INDEPENDENT SCHOOL<br>DISTRICT AND LARRY B.<br>BRUNT,<br>    Defendants | )(<br>)(<br>)(<br>)(<br>)(<br>)(  CIVIL ACTION NO. B-04-052<br>)(<br>)(<br>)(<br>)( |

ORAL DEPOSITION OF
LARRY B. BRUNT
JANUARY 3, 2005


COPY

    ORAL DEPOSITION OF LARRY B. BRUNT, produced as a witness at the instance of the PLAINTIFF, taken in the above-styled and numbered cause on JANUARY 3, 2005, reported by RHONDA A. MARTIN, Certified Court Reporter No. 4297, in and for the State of Texas, at the offices of Willette & Guerra, L.L.P., 1534 East 6th Street, Suite 200, Brownsville, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached therein.

BRYANT & STINGLEY, INC.
McAllen        Harlingen        Brownsville
(956)618-2366   (956)428-0755   (956)542-1020
(800)462-0253 (STATEWIDE)

## APPEARANCES

COUNSEL FOR PLAINTIFF:

    JANICE A. CASSIDY, P.C.
    ATTORNEY AT LAW
    550 North Sam Houston
    San Benito, Texas 78586


COUNSEL FOR DEFENDANT HARLINGEN CONSOLIDATED
INDEPENDENT SCHOOL DISTRICT:

    BRIDGET R. ROBINSON
    WALSH, ANDERSON, BROWN, SCHULZE & ALDRIDGE
    6300 La Calma, Suite 200
    Austin, Texas 78752


COUNSEL FOR DEFENDANT LARRY B. BRUNT:

    EILEEN M. LEEDS
    WILLETTE & GUERRA, L.L.P.
    1534 East 6th Street, Suite 200
    Brownsville, Texas 78520


ALSO PRESENT:

    Dr. Maria Christina Garcia


## INDEX

|                                                  | PAGE |
|---|---|
| Appearances ............................................ | 2 |
| **LARRY B. BRUNT** | |
| Examination by Ms. Cassidy ...................... | 4 |
| Examination by Ms. Robinson ..................... | 160 |
| Examination by Ms. Cassidy ...................... | 164 |
| Errata Sheet/Signature Page ..................... | 170 |
| Reporter's Certificate .......................... | 171 |

Attached to the end of the transcript: Stipulations

BRYANT & STINGLEY, INC.
McAllen    Harlingen    Brownsville
(956)618-2366  (956)428-0755  (956)542-1020
(800)462-0253 (STATEWIDE)

Page 18

1  Q. Okay. And with HealthSouth you didn't have a
2  contract, correct?
3  A. No, ma'am.
4  Q. Okay. So the only places that you had
5  contracts are with school districts; is that correct?
6  A. Correct. Correct.
7  Q. Did you bring any documents with you today in
8  response to your deposition notice and the subpoena
9  duces tecum?
10      MS. LEEDS: Yes, but just for the record,
11  we're going to be objecting because it wasn't within --
12  or outside the 30 days, but we do have some documents.
13  And --
14      MS. CASSIDY: I believe some of them were
15  attached to the discovery responses, except my copies
16  are so bad I can't read them. I think there's a -- his
17  TEA license is attached, a copy of that, a copy of the
18  training certificate, but I can't read them.
19      MS. LEEDS: Okay. Well --
20      MS. CASSIDY: So my question is I just
21  need a better copy.
22      MS. LEEDS: Well, this is his teacher's
23  certificate.
24      MS. CASSIDY: Your copy is atrocious as
25  well. I can't -- I can't tell that this is his. I see

Page 19

1  a Social on the bottom. Can we get a better copy of
2  this somewhere?
3  Q. Where is the teaching certificate?
4  A. I have no idea.
5  Q. Is a teaching certificate something that you
6  hold or does it have to be on file somewhere?
7  A. I have no idea. I don't believe I've ever seen
8  mine. I assume it's on file with the schools. I don't
9  know. I've never seen one.
10  Q. When did you earn your teacher's certificate?
11  A. In 1974.
12  Q. Okay. And as near as I can tell from here,
13  you're certified in biology, health, and physical ed?
14  A. Yes, ma'am.
15  Q. Okay.
16  A. May I?
17  Q. Sure.
18      THE WITNESS: '74.
19      MS. LEEDS: Uh-huh.
20      THE WITNESS: And I know it's a bad -- I
21  know it's a bad copy, but this says 1974.
22      MS. LEEDS: Yeah.
23      THE WITNESS: And I assume that's my
24  Social Security number.
25      MS. LEEDS: Well, you can probably make

Page 20

1  out your name.
2      THE WITNESS: Well, that's true, too.
3      MS. LEEDS: And your Social.
4  Q. Okay. What about your training license?
5      MS. CASSIDY: There was a copy of that,
6  but I can't read mine either.
7      MS. LEEDS: You mean the athletic training
8  license?
9      MS. CASSIDY: Right. Uh-huh. Yes, that
10  one.
11  Q. Okay. So this is a copy of your -- this is a
12  much better copy. I could use a copy of this. This
13  says, "Licensed Athletic Trainer, Awarded January 11th,
14  1996," and there's a license number, and it expires
15  12-31-96; is that correct?
16  A. Correct.
17  Q. Okay. Now, do you get a new one every year
18  that has a new date on it?
19  A. Correct. When you pay your dues, you -- you
20  receive a new one.
21  Q. So do you have a new one?
22  A. I had just recently paid my dues and it just
23  hasn't come in the mail yet.
24  Q. Okay. What about the one that was in effect
25  when you were at the Harlingen ISD?

Page 21

1  A. I don't understand your question.
2  Q. Well, okay. Then let me not presume anything.
3  During the time that you were employed with Harlingen,
4  okay, between 1999 and 2001, did you have a training
5  license in effect?
6  A. Yes, ma'am.
7  Q. Okay. And do you have a copy of the license
8  for those two years?
9  A. For this year?
10  Q. For those two years.
11  A. Oh, those two years?
12  Q. For the years you were employed with the
13  Harlingen ISD.
14  A. I would have to go and look in my records to
15  see and/or the school district should have a copy of
16  it. We -- we -- we always gave the school district a
17  copy of them every year.
18  Q. Okay. So in order to keep this in effect, do
19  you have to do a certain amount of --
20  A. Continuing ed hours, yes, ma'am.
21  Q. Okay. How many per year?
22  A. It's 30 in three years.
23  Q. 30 in three years. And then you have to pay a
24  fee?
25  A. Correct.

Page 26

1  that made you uncomfortable? What was it that -- let's
2  put it this way. Let me be clear about this.
3       What are you saying -- what made you
4  fearful of your employer?
5     A. The school district did their investigation
6  without me. I had absolutely nothing to do with it.
7  I -- I asked if I could be a part of it and was
8  told "no." I volunteered information that -- that I
9  could have had and was -- was declined. I -- I was put
10 on administrative leave and not really given much
11 information as to why. It was strictly the school
12 district by itself doing its own work.
13    Q. When did you first become aware that there was
14 such an investigation? And we're talking about the
15 investigation of the allegations made by Cynthia
16 Espinosa.
17    A. The day that I was called into Mr. Nava's
18 office.
19    Q. And is that the day that you gave the statement
20 that we're talking about?
21    A. No.
22    Q. Okay. Do you recall when you were called into
23 Mr. Nava's office?
24    A. The date?
25    Q. Yes.

Page 27

1     A. No, ma'am, I do not. I'm going to assume it's
2  going to be the date that I was put on administrative
3  leave.
4     Q. All right. Well, let me ask you this. Your
5  statement that we have here that I've made reference to
6  is dated -- it was taken on February 27th of 2001 at
7  1:30. Were you called into an office to discuss this
8  before that date?
9     A. Before that date, I was called into the office
10 and was put on administrative leave for the -- if you
11 have a copy of that administrative leave in there,
12 you'll see that the reason for the administrative leave
13 was for, I want to say, inappropriate actions with a
14 female, and was told that there would be an
15 investigation in it and that I was to refrain from
16 being on the campus or having anything to do with the
17 school district. And that was the last that I was
18 around.
19    Q. So were you called in and told that first or
20 did somebody just give you a piece of paper that says
21 you're on administrative leave?
22    A. No. I was called into the office and told
23 that.
24    Q. Were you asked questions at that point, the
25 first time you went in?

Page 28

1     A. No, ma'am, I don't believe so.
2     Q. And then how long after that were you called
3  into the office to give the statement that we have
4  recorded?
5     A. I want to say it was a couple of weeks. The
6  exact date, I don't know.
7     Q. How long were you off work -- excuse me.
8     A. Go ahead.
9     Q. Were you finished?
10    A. Yes, ma'am. Yes, ma'am.
11    Q. How long were you suspended with pay? Or you
12 may be able to remember -- how long were you out of
13 work between the time you first heard about the
14 allegations and the time you tendered your resignation?
15    A. Two or three weeks.
16    Q. Okay. Did you think that the school district
17 did not have a right to investigate the allegations?
18    A. Oh, no. They do have a right to investigate
19 them.
20    Q. Well, in what way do you think that you could
21 have -- in what way should it have been treated
22 differently?
23    A. I thought that I should have been included in
24 it because I was an employee.
25    Q. In what way could you have helped?

Page 29

1     A. I -- I was offering my help for anything that I
2  knew of anything they wanted to ask.
3     Q. And they eventually did ask that in February --
4     A. Correct.
5     Q. -- on February 27, 2001?
6     A. Correct. Yes, ma'am.
7     Q. And you gave them the information then; is that
8  correct?
9     A. Yes, ma'am.
10    Q. Did you get the impression the first time you
11 were called in that the school district was -- the
12 school district believed the allegations?
13    A. I knew absolutely nothing of anything that was
14 going on, and that was part of my perplexment, was I --
15 there was not -- very little said about anything.
16    Q. All right. Well, then let me ask you this
17 because I think I'm assuming too much. When you were
18 called in the first time, were you told it was a
19 student?
20    A. Yes, ma'am.
21    Q. Were you told which student?
22    A. No, ma'am.
23    Q. Okay. Were you told anything about what you
24 were -- was alleged to have occurred?
25    A. No, ma'am. "Inappropriate actions with a

Page 38

1   A. Yes.
2   Q. -- to -- to handle injuries during the --
3   A. Yes.
4   Q. -- 1999-2000 season?
5   A. I -- that particular year, I don't know. We
6   were -- we were always called in if there was an
7   injury. That's what we were there for, whether --
8   whether it was then or any other time.
9   Q. Okay. Were you ever called into the weight
10  training room to address injuries of Cindy Espinosa?
11  A. Into the weight room?
12  Q. Yes.
13  A. Not that I remember.
14  Q. Did she work out in there?
15  A. I don't know. I'm sure the sport delegated she
16  should, but I -- I -- I do not know if she was in the
17  room working out or not. I just -- I don't know.
18  Q. What was your understanding of why Ms. Espinosa
19  was taking the medication you told us about earlier?
20  A. Why did I think she was taking this?
21  Q. Right. What was your understanding?
22  A. Oh, her mother had told me several times that
23  she was on different medicines for her eating disorders
24  and her panic attacks and her mood swings.
25  Q. What did you know about her eating disorder?

Page 39

1   A. She had had problems with an eating disorder
2   before I ever was employed at the Harlingen CISD and
3   she continued to have eating disorders throughout her
4   school tenure.
5   Q. And in what -- how do you know that?
6   A. Her mother would tell us that.
7   Q. Okay. Besides anything that her mother told
8   you, do you have any firsthand personal knowledge about
9   her -- that she, in fact, had an eating disorder?
10  A. We saw her many times that she would come into
11  the training room just exhausted from a lack of food
12  intake and her output as an athlete. That's something
13  that you can see and something that we would quiz her
14  on.
15      If she was just, you know, exhausted from
16  the end of a practice and would lay down on our tables,
17  we would ask her, you know, how she felt or if anything
18  was wrong and she would say that she hadn't eaten.
19  Q. So from that, you figured that supported what
20  her mother had told you about her eating disorder?
21  A. Correct.
22  Q. Did you see any other manifestations of it?
23  A. Of the eating disorder?
24  Q. Yes.
25  A. No.

Page 40

1   Q. Did you ever see her get sick?
2   A. She was sick a lot.
3   Q. I mean vomit. I mean actually vomit.
4   A. No. She hid that very well from us.
5   Q. When you say "from us," who is "us"?
6   A. Heather and myself.
7   Q. Tell me about Heather.
8   A. Heather is a female athletic trainer that the
9   school district hired after -- after I was hired.
10  Q. When was she hired?
11  A. A year after I was hired.
12  Q. So that would have been sometime in -- in the
13  2000-2001 season?
14  A. Yes, ma'am. Yes, ma'am. Yes, ma'am.
15  Q. Okay. And during the 1999-2000 soccer season,
16  were you the only trainer -- athletic trainer?
17  A. No. There was a -- there was another young man
18  there that I was replacing, and his name is Todd. I
19  forget his last name. And that was the reason that I
20  was brought in, was to replace Todd. It was a known
21  fact that Todd was leaving. And I came in and I spent
22  time between the two campuses until Todd actually left.
23  So I was in and out of the facility there at Harlingen
24  South.
25  Q. How long did your tenure and Todd's overlap?

Page 41

1   How many -- what period of time?
2   A. About half a year, to the end of the school
3   year.
4   Q. Okay. So you came on -- did you come in on the
5   beginning of the soccer season in 19 -- in 2000 --
6   A. I --
7   Q. -- from 1999?
8   A. I have no idea. I came in in the middle of
9   everything. I want to say that I came in during
10  football season. So football would be before soccer
11  started.
12  Q. So are you saying you came in before the
13  regular season of soccer started in December?
14  A. Yes, ma'am.
15  Q. Okay. So you were there as part of the
16  off-season?
17  A. If they were having off-season then. I mean, I
18  don't -- I don't remember if they -- I don't remember
19  if that particular year they were having off-season in
20  the beginning of the year or if they were going to have
21  it at the end of the year because I -- I was new.
22  Q. Well, what kind of training happens preseason?
23  In other words, kids just don't show up one day in the
24  beginning of the soccer season and start playing,
25  right? I mean, there's some sort of practice?

Page 42

1  A. UIL gives you a certain amount of time that you
2  have. You hear the old saying of two-a-days in
3  football. And there's an amount of time delegated and
4  regulated by UIL that you can practice before a season
5  starts, and that's the preseason. The athletic period
6  is what the coaches use to keep the kids in condition
7  for the -- the next year.
8  Q. So my question to you is to help you remember
9  when you came on board. Were they practicing before
10  the beginning of the December season in 1999 or did you
11  come on board when they were already in the season?
12  A. It would have to be before I -- I -- being
13  there during football season, I would have been there
14  before.
15  Q. So you're saying you were there at least maybe
16  November of 1999?
17  A. Yes, ma'am.
18  Q. Okay. Why was Todd leaving?
19  A. He had an opportunity to go to another school
20  in San Antonio and he had always wanted to live in San
21  Antonio.
22  Q. So is it your testimony -- and I don't want to
23  misquote you. Did Todd stay until the end of the
24  school year?
25  A. Yes, ma'am.

Page 43

1  Q. 2000?
2  A. Yes, ma'am. Yes, ma'am.
3  Q. So he resigned effective the end of the school
4  year in 2000, May or whatever?
5  A. Yes, ma'am.
6  Q. Okay. If you need to take a break or visit
7  with your attorney or anything like that, just give me
8  a holler. Okay? That's fine.
9  A. I need to get my cough drops.
10  Q. Okay. Go ahead.
11  A. Go ahead.
12  Q. Okay. So during the time -- from the time you
13  started with the Harlingen Independent School District
14  and the end of the 2000 school year in June, you --
15  there were two athletic trainers, you and Todd,
16  correct?
17  A. Correct.
18  Q. And what's Todd's last name?
19  A. I don't remember.
20  Q. Okay. Then starting in the fall, were you the
21  only athletic trainer?
22  A. Yes, ma'am, until we hired Heather.
23  Q. And when did Heather come on board?
24  A. I don't exactly know. I want to say at the
25  endish of football season.

Page 44

1  Q. So you're saying she started around the same
2  time you did a year later?
3  A. Yes, ma'am. Yes, ma'am.
4  Q. Okay. So about November of 2000 she came on
5  board?
6  A. Yes, ma'am. Female athletic trainers are hard
7  to come by, and it took us that long to -- to get her.
8  Q. Where did she come from? Where did you find
9  her?
10  A. I think she was in Houston. I think.
11  Q. Well, did -- was the position advertised?
12  A. I don't know. I don't do the advertisements
13  for the school district. I had requested a female
14  athletic trainer.
15  Q. Why?
16  A. That's the -- that's the -- one of the major
17  steps in a sports medicine practice is that you have a
18  male and female athletic trainer on your campus so that
19  incidents do not happen. And we all realized that, and
20  we actively started looking for one as soon as we
21  could.
22  Q. Did -- and so do you have any idea when the
23  search for the female athletic director started?
24  MS. LEEDS: Trainer.
25  A. Athletic trainer.

Page 45

1  Q. Trainer. Excuse me.
2  A. I think in the summer after -- when Todd had
3  left, I think we started looking during that summer to
4  try to find one.
5  Q. And you have no idea why nobody started to look
6  earlier knowing that Todd was leaving for the last
7  six --
8  A. Well, the school district had just begun the
9  implementation of -- of two athletic trainers at each
10  campus when I came on. That was one of my -- my
11  reasons for being there, was to come in and implement
12  the sports medicine program that Mr. Zamora and I had
13  started in Brownsville and Corpus Christi where you do
14  have two athletic trainers at each place. And we -- we
15  started as soon as we could, as soon as I was fully on
16  board.
17  Q. Is there a school policy about -- well, let me
18  ask you this.
19  When you started in 1999, was there a
20  school policy about male trainers treating female
21  athletes?
22  A. I do not know. I have not seen such a policy.
23  Q. Okay. And in -- after Heather was hired in
24  2000, was there a school policy about male trainers
25  treating female athletes?

Page 58

1    A. Correct.
2    Q. So Heather could just as easily have gone out
3  and treated the male students; is that correct?
4    A. Correct, and she did at times.
5    Q. Okay. But they felt more comfortable with you,
6  correct?
7    A. Yes, ma'am.
8    Q. What about the female soccer players?
9    A. Same thing.
10   Q. Was there any consideration given to the fact
11 that they might prefer a female trainer?
12   A. They were given that option. When -- when we
13 first brought Heather on, we -- Heather and I made it a
14 point to go to each team, boys or girls, and tell them
15 that we were both available and that if they had anyone
16 that wanted in particular a male or a female to work on
17 them, that they could then request that.
18   Q. So you went to the soccer team --
19   A. Correct.
20   Q. -- you went to the football team, you went to
21 the basketball team --
22   A. Correct.
23   Q. -- and you told each and every one of them
24 that?
25   A. Correct.

Page 59

1    Q. And did the football team specify that they
2  would prefer you?
3    A. No.
4    Q. Then how did you get the impression that they
5  would just feel more comfortable with a male trainer?
6    A. Just my feeling.
7    Q. During the period between -- well, let's talk
8  about preseason 2000. That's before -- that's after
9  Todd left and before Heather came on board; is that
10 correct?
11   A. Yes, ma'am.
12   Q. Okay. Were you the only one responsible for
13 athletic training during that time frame?
14   A. Correct.
15   Q. Okay. And how early does preseason training
16 start?
17   A. Preseason for which sport?
18   Q. Excuse me. Excuse me. Bad question.
19        How early does preseason training for
20 soccer -- girls' soccer start?
21   A. I think it begins after the Christmas holidays.
22   Q. Okay. That's at the end of December?
23   A. Correct. Correct.
24   Q. We're talking about preseason.
25   A. Right. We'd have to look at a UIL calendar and

Page 60

1  see when they -- when they delegated it to start.
2    Q. Well, just as -- as an athletic trainer, you
3  told us that the soccer season, girls' soccer, runs
4  from December to April, approximately?
5    A. Correct.
6    Q. Okay. So as I said before, they don't start
7  up -- they don't come -- the students don't show up at
8  the beginning of December and say, "I'm playing on your
9  team"?
10   A. Correct.
11   Q. So how early before your season starts in
12 December do the students or these athletes begin
13 practicing?
14   A. They -- they would be in their athletic period,
15 so that would be year round.
16   Q. So they just -- that's all they do? They don't
17 come extra time. They do the athletic period year
18 round and then they show up to play team soccer in
19 December?
20   A. If they are soccer soloists, yes, but the
21 majority of them would play another sport and they --
22 you know, they would be in basketball and come from
23 basketball and go to soccer or they would be in
24 cross-country and come from cross-country and go into
25 soccer. There's -- there's -- again, that's -- you

Page 61

1  know, that's up to the students and their schedule that
2  they have.
3    Q. How many -- what other sports did Cindy
4  Espinosa play?
5    A. I don't know. I think she was in the -- I
6  think once upon a time she played basketball, and,
7  really, that's all I can recollect.
8    Q. Well, did you ever treat her for any basketball
9  injuries?
10   A. I did not.
11   Q. So do you think you'd recall if she played
12 basketball?
13   A. That's -- we had so many students playing in so
14 many sports, I -- I would like to say "yes," but I
15 can't -- I can't honestly say "yes."
16   Q. Did she engage in cross-country -- the
17 cross-country team?
18   A. Not that I remember.
19   Q. Did you treat Cindy Espinosa for soccer
20 injuries?
21   A. Correct. Yes.
22   Q. What kind of injuries did you treat her for?
23   A. Ankle sprains -- I think she had had an old
24 knee surgery -- and the usual bruises and traumas of
25 contact soccer.

16 (Pages 58 to 61)

**BRYANT & STINGLEY, INC.**

www.bryantstingley.com                                    (956) 428-0755

Page 62

1  Q. And how much of what you just told me do you
2  remember from working at the ISD and how much did you
3  get from her deposition?
4  A. Oh, I remember the majority of it from working
5  on her.
6  Q. Okay. So you remember that she had an old knee
7  injury?
8  A. Correct. She had -- she had, as they say, the
9  scars to prove it. And -- oh, and her mother had --
10 had requested that we work on her, too.
11 Q. Request that you work on what?
12 A. Her knees, to make them stronger so she
13 wouldn't have more trouble with them during the year.
14 Q. Okay. Who -- her mother made that request to
15 whom?
16 A. To me.
17 Q. You personally?
18 A. Correct. Heather was not employed with us at
19 that time.
20 Q. Okay. So this was during the 1999-2000 season,
21 correct?
22 A. Yes.
23 Q. So how did you go about doing what Mom asked
24 you to do?
25 A. We would develop a knee-strengthening program

Page 63

1  and give it to the coaches and -- and ask that they
2  implement it during their athletic period, either in
3  the weight room or during their athletic period.
4  Q. And did you give such a knee-strengthening
5  program to a coach for Cindy Espinosa?
6  A. Correct.
7  Q. Which coach?
8  A. Coach Pedraza.
9  Q. And did he work on the knee-strengthening
10 program with her?
11 A. I don't know.
12 Q. Did you check?
13 A. I'm sure we did, but I -- again, the volume of
14 students we -- we had to go by face value. The fact
15 that she made it through the season tells that -- that
16 she did some work on this.
17 Q. Okay. Do me a favor -- and this is probably a
18 bad time right in the middle of this to ask this
19 question, but tell me exactly what you did. Now, you
20 told me about your hours, but tell me exactly what an
21 athletic trainer does.
22 A. The definition of an athletic trainer is the
23 care and prevention of athletic injuries. We would --
24 if an athlete was under orders from a physician, we
25 would carry out those orders, whether it be for taping

Page 64

1  or rehabilitation. If the athlete was not under orders
2  from a physician, we would work with the athlete and
3  their limitations and/or their strengths to build them
4  and the injured part back to a competitive level or
5  back to a level of usage that they could compete in
6  regular athletics again.
7  Q. Let me ask you this. Were there times during
8  the day during the school year that you just didn't
9  have anything to do?
10 A. No. No.
11 Q. Were there that many injuries?
12 A. It wasn't the injuries. It was the athletic
13 periods. We had an athletic period first period, and
14 then I think we had one in the middle of the day, and
15 then we had the one at fifth period. And in order to
16 see the athletes that come in, the training room
17 becomes just a horrendous mess. And what we would do
18 is -- we have to keep a -- in South Texas, you have to
19 keep a fairly sterile environment or you're asking for
20 trouble with infections. So we would have to take the
21 training room back apart, clean it down, restock the
22 items that we used, gauze pads to Band-Aids to tape to
23 water or whatever the case may be, and then it would be
24 about time for the next athletic period to begin.
25 Q. But the athletic -- the athletes then went into

Page 65

1  the training room -- or not the training room -- into
2  the workout room, correct?
3  A. You lost me.
4  Q. Okay. When they would be on their athletic
5  period, they would -- they wouldn't come into the
6  training room; is that correct?
7  A. They would come into the training room to get
8  an ankle taped or to get a cut cleaned and dressed or
9  to have an Ace wrap applied, yes, and then they would
10 go to their athletic period.
11 Q. So they would come into their athletic period
12 with injuries?
13 A. Yes.
14 Q. Where would they get the injuries?
15 A. From athletic period or games, from the
16 participation in the sports they were in.
17 Q. But if they had an injury from a game that they
18 participated in, wouldn't they be treated right then
19 and there?
20 A. Correct.
21 Q. So we're talking about during a class period --
22 let's say, for example, a child comes out of English --
23 a student comes out of English and then goes to
24 athletic period.
25 A. Okay.

17 (Pages 62 to 65)

**BRYANT & STINGLEY, INC.**

www.bryantstingley.com                                (956) 428-0755

Page 82

1  Q. Were you given it?
2  A. Was I given one?
3  Q. Yeah.
4  A. I don't remember.
5  Q. Do you ever remember reading?
6  A. At times, yes. There were -- there were
7  instances I -- that I -- that I best remember, there's
8  a -- there's a book about that big that's in the
9  assistant principal's office that has different
10 policies and things that come out and it's updated
11 constantly as the board updates it. And we are invited
12 to -- to go look at that, and I have.
13 Q. Is there any requirement that you go read the
14 book you're talking about?
15 A. I do not remember that. I don't remember.
16 Q. So to the best of your recollection, as you sit
17 here today, did you ever -- did the school district
18 give you something and require you to sign a piece of
19 paper that says, "I've received it and I've read it"?
20 A. I'm going to have to say I don't remember that
21 I did that. There may well be one, but I just -- I
22 don't remember signing one.
23 Q. What kind of things did you read in the book
24 that was in the -- that you referred to earlier? Where
25 was it kept? In the training room? In the library

Page 83

1  room?
2  A. No, no, in the assistant principal's office.
3  Q. The assistant principal?
4  A. It would be different policies that -- that the
5  board had implemented, like, "We have taken this
6  insurance company and it's now going to be your
7  insurance for the school district." "Students are not
8  to leave the campus without written information from
9  their parents." Just different items like that.
10 Q. When these new policies would be implemented,
11 were you just told you can go look at them someplace or
12 were you given a copy? Did anybody -- did they just --
13 did the school district distribute copies to the
14 personnel so that they would be aware that there was a
15 new policy?
16 A. I think at the faculty meetings, they were
17 presented out and said, "These are new policies that
18 are going to be out like that and they will be in the
19 assistant principal's office. You know, you need to go
20 and make yourself familiar with them."
21 Q. How often would there be a faculty meeting?
22 A. Biweekly, monthly. I don't really recall.
23 Q. Were you required to attend the faculty
24 meetings?
25 A. Correct.

Page 84

1  Q. So did you basically make most of them?
2  A. I guess.
3  Q. Okay. What if they conflicted with a game?
4  A. Well, that's why I say I guess. If there
5  was -- if there was something else going on and we were
6  not in town, we obviously wouldn't make that.
7  Q. When would a faculty meeting -- when were the
8  faculty meetings held?
9  A. The time of day?
10 Q. Yes.
11 A. I think in the afternoons.
12 Q. So if you were -- if there was a practice game
13 in session, would you make the faculty meeting?
14 A. Not if I was not on the campus, no.
15 Q. Well, what about if you were on the campus? If
16 there's -- if there's a team practicing, you're the
17 trainer, you're in the training room or you're out at
18 the game, what happens to the faculty meeting?
19 A. If -- if -- during the time when Heather was
20 there, one of us would go to the faculty meeting and
21 bring back the information to the other one. When I
22 was by myself, I would be covering the team.
23 Q. So nowhere in your home or anywhere do you have
24 any personnel policy that you received from the school
25 district; is that correct?

Page 85

1  A. I do not, correct.
2  Q. Have you received a personnel policy since you
3  left there? Has the school district provided you with
4  a personnel policy to review since you resigned?
5  A. No.
6  Q. What was the school district's -- well, let me
7  ask you this.
8     Did the school district -- did you attend
9  a class concerning -- or any sort of seminar about
10 sexual harassment while you were with the Harlingen
11 School District?
12 A. I don't remember that I did.
13 Q. In fact, I believe in your statement you
14 were -- you were asked if you had taken a sexual
15 harassment course. Do you remember that?
16 A. I believe so.
17 Q. Do you remember what you said?
18 A. I think I said that I did not because of the
19 time that I came in to work for the school district.
20 I -- if they had one that year, I had already missed
21 it.
22 Q. Okay. And that was during the 1999-2000 year?
23 A. Correct.
24 Q. Is that correct?
25 A. Yes, ma'am.

22 (Pages 82 to 85)

**BRYANT & STINGLEY, INC.**

www.bryantstingley.com                        (956) 428-0755

Page 94

1  asked to go by or you don't call kids' houses unless
2  you're asked to do so.
3    Q. Did you ever go to the Espinosa household?
4    A. Yes, I did.
5    Q. How many times were you there?
6    A. Once.
7    Q. And when was that?
8    A. For a New Year's Eve open house.
9    Q. And what year was that?
10   A. 2001.
11   Q. That was the New Year's Eve January 2001?
12   A. Correct. Yeah.
13   Q. Okay. And how did you happen to go there?
14   A. Mrs. Espinosa and Cindy asked me to go one day
15 in the training room.
16   Q. Were they both, Mrs. Espinosa and Cindy, in the
17 training room?
18   A. Correct. Mrs. Espinosa's English is not that
19 good, so through Cindy they asked me to go.
20   Q. And who initiated -- who initiated the request?
21   A. One of them. I don't -- I don't recall.
22   Q. And so did you go?
23   A. Yes, I did.
24   Q. And did you go by yourself?
25   A. Yes, I did.

Page 95

1    Q. Did you take anything with you?
2    A. I took a bottle of champagne with me, yes.
3    Q. And to whom did you give the bottle of
4  champagne?
5    A. I think I gave it to Cindy and her father. The
6  mother was talking with other people in the other end
7  of the house and I wanted to give it to a member of the
8  household.
9    Q. So you didn't just give it to Cindy?
10   A. No. Her father was there. No. You don't -- I
11 wouldn't do that.
12   Q. So you read her deposition where she said you
13 gave her the bottle of wine?
14   A. Correct.
15   Q. And you disagree with that?
16   A. Correct.
17   Q. Did you know anybody at the house that night?
18   A. I may have known one or two of the other
19 parents that were there. The rest of them were the
20 acquaintances of the Espinosa family.
21   Q. Do you remember anybody that you recognized and
22 knew at that party?
23   A. I -- off -- off the top of my head, I would
24 have to say Mrs. Gramley, and there are one or two
25 other people, but I don't -- I don't remember their

Page 96

1  names, no.
2    Q. Was Ms. Kavanaugh there?
3    A. Oh, correct. Ms. Kavanaugh. Right. Right.
4    Q. How did you know Ms. Kavanaugh?
5    A. Her daughter was -- was an athlete and the
6  mother was a concerned parent and we knew each other.
7    Q. Were you dating?
8    A. Was I dating?
9    Q. Ms. Kavanaugh.
10   A. No.
11   Q. Did you date her after that?
12   A. We went to dinner once or twice, I think, but a
13 formal date, I don't -- I don't recall.
14   Q. So after that night at the Espinosa household
15 you had dinner with Ms. Kavanaugh once or twice?
16   A. I think so.
17   Q. Were you the only two having dinner?
18   A. I guess. Again, that's five or six years ago.
19   Q. Does Ms. Kavanaugh have an eating disorder?
20   A. Not that I know of.
21   Q. How long did you stay at the Espinosa household
22 that evening?
23   A. I think until right after New Year's.
24   Q. And what time did you arrive?
25   A. Maybe an hour before.

Page 97

1    Q. So you arrived about 11:00?
2    A. Yes, ma'am. About.
3    Q. And you left shortly after midnight?
4    A. Yes, ma'am.
5    Q. When was the -- the invitation extended to you
6  to attend the New Year's Eve open house at the Espinosa
7  household?
8    A. I can't recall. I'm sure it was in December
9  sometime.
10   Q. So did you speak with anybody in the Espinosa
11 household between the time the invitation was extended
12 and the time you showed up at 11:00 that night?
13   A. Oh, I'm sure I did. The -- the parents were
14 always on campus and at practice and in the training
15 room. I'm -- I'm sure I did.
16   Q. Well, let me ask you this. When did --
17 routinely when -- well, let me ask you this.
18      In 1999, when did school get out for the
19 Christmas holidays? Do you recall?
20   A. No. Whenever the school calendar lets it out.
21   Q. How long before -- usually how long is
22 Christmas vacation?
23   A. A couple of weeks, I think.
24   Q. Does the soccer team practice during Christmas
25 break?

25 (Pages 94 to 97)

**BRYANT & STINGLEY, INC.**

www.bryantstingley.com                                           (956) 428-0755

### Page 114

1   Q. Okay. Do you know if Heather referred Lindsey
2   Gramley to Dr. Cartwright's office?
3   A. I -- I do not know.
4   Q. Okay. Do you know if anybody at the school
5   district, Heather or anyone else, referred students
6   over to Dr. Cartwright after you resigned from the
7   school district?
8   A. No, ma'am, I don't.
9   Q. So you treated a couple of football players and
10  who else?
11  A. A young man that ran track. Gosh, I don't
12  remember his name. He had -- he had a very bad ankle.
13  Q. So you treated no female student from the
14  Harlingen School District at Dr. Cartwright's office
15  after you resigned your employment at the school
16  district?
17  A. Not that I remember.
18  Q. Do you remember a soccer player by the name of
19  Nadia Costa-Luna or Costa -- I'm not sure which last
20  name she used. Do you remember her?
21  A. Yes, ma'am.
22  Q. Okay. Did you know her father?
23  A. I eventually knew her father. I knew of her
24  father.
25  Q. How did you come to know her father?

### Page 115

1   A. He was a parent of the soccer team and he had
2   the reputation of being very vocal and very ascetic
3   towards people.
4   Q. And was he that way towards you?
5   A. I never really met him. The only time I -- I
6   face-to-face met him was at a meeting that Dr.
7   Cartwright and I put on at the hospital. The only
8   other times that I remember having anything to do with
9   him was one time his daughter had been butted in the
10  head, and as I had her off of the field, there was a
11  voice up in the stands -- and, again, remember, this is
12  100, 200 meters away -- that kept screaming out, "Her
13  heart rate." And I took her heart rate and made a hand
14  signal of it, like 75, to the person that was doing the
15  screaming at me. And later on I found out that that
16  was her father. Yes.
17  Q. How did you take her heart rate?
18  A. Take it off of her radial pulse.
19  Q. And where was she when you took the heart
20  rate -- took her heart rate?
21  A. I think we were walking off of the field. I
22  was trying to stabilize her so she didn't trip or fall
23  or anything like that.
24  Q. And how were you doing that?
25  A. You hold on to the athlete by the shoulders and

### Page 116

1   stabilize them like that and make sure they come off.
2   Q. Okay. Where -- when you're -- now you're
3   demonstrating. You're putting your right hand around
4   as if you would grab her shoulder?
5   A. Correct.
6   Q. And she would be on your right; is that
7   correct? Where is your left hand?
8   A. Well, either the right or the left. The left
9   hand I'm either holding tape or a pair of scissors
10  or -- in this case, I used one hand to -- to check her
11  pulse, to count it down so that I could give him the
12  information.
13  Q. So are you saying that you had one arm around
14  her arm and then the other arm -- your hand -- your
15  left hand taking her pulse?
16  A. Yes, ma'am.
17  Q. So you would be taking her pulse off her left
18  arm?
19  A. Yes, ma'am. Well, again, depending on which --
20  I don't remember what side I had ahold of her on.
21  Q. Did Dr. Costa-Luna then come down from the
22  stands?
23  A. No, ma'am. The school district has had trouble
24  with parents like this many times before and they've
25  taken extra steps in that. There is usually a police

### Page 117

1   officer at the stadium that -- that keeps people,
2   parents, well-wishers, anything else, off of the
3   playing field. So he would not have been allowed on
4   the field.
5       Now, the only time he could have come onto
6   the field was after the game, and I was gone by then.
7   I mean, I did not -- I -- I never got to meet the man.
8   Q. Did you see the affidavit signed by Dr.
9   Costa-Luna in this case?
10  A. Yes, I did.
11  Q. And correct me if I'm wrong, in that affidavit
12  he said that he came to you and told you to take your
13  hands off his daughter. Is that what it says?
14  A. Correct.
15  Q. And he signed it under oath; is that correct?
16  A. Correct.
17  Q. Do you disagree with that?
18  A. I -- yes, ma'am, I do.
19  Q. And why do you disagree with that?
20  A. Because he is accusing me of something that,
21  number one, didn't happen. And, number two, from 100,
22  200 meters away, I -- I just -- I find it almost
23  impossible for him to have seen me doing anything that
24  was wrong, which -- I'm -- I'm sure he may have seen
25  something that he felt was wrong, but there was nothing

**Page 118**

1  wrong.
2  Q. Are you saying that the distance that the --
3  the fans, parents, school officials sit from the field
4  is too great a distance to see what you're doing?
5  A. Not -- not so much that. They can see us, but
6  for him to say that I am inappropriately touching his
7  daughter just makes no sense to me. My -- my
8  understanding of inappropriate touching is not trying
9  to stabilize a person, helping them off the field when
10  they're wobbling. And where he derived that I was
11  inappropriately touching his daughter by doing that is
12  just -- is just beyond me.
13  Q. You do realize he's a pediatrician?
14  A. Yes, ma'am.
15  Q. Okay. Do you think that he would have some,
16  you know, experience in -- in touching and treating
17  minor patients?
18      MS. LEEDS: Object to the form.
19  A. He should.
20  Q. So is it your sworn testimony today that after
21  that game, at any point from the time his daughter was
22  injured through the rest of the game until after the
23  game, he never came up to you and said anything to you
24  about inappropriately touching his daughter?
25  A. Correct. It would be impossible for that to

**Page 119**

1  happen.
2  Q. So where was that game? Do you remember?
3  A. Here at Boggus Stadium.
4  Q. Do you realize -- do you remember who the
5  school was playing -- the team was playing?
6  A. No, I don't.
7  Q. And when was that game?
8  A. Soccer season.
9  Q. What year?
10  A. 2001, I assume.
11  Q. Well, do you know or are you guessing?
12  A. I'm guessing. I do not know.
13  Q. How do you -- let me ask you, you do some --
14  the soccer team does play away games, correct?
15  A. Yes, ma'am.
16  Q. So how do you know it was at Boggus Stadium?
17  A. Because of the position that he was in in the
18  stands screaming at -- at me to give him a heart rate.
19  Q. How do you know that that's the game that he's
20  referring to? Could there have been another game at
21  one time that he's yelling about a heart rate, another
22  time he's complaining about something else?
23  A. This is the only time I ever heard that.
24  Q. Well, heard what?
25  A. That he was asking for information about his

**Page 120**

1  daughter on. And the rest of the time I've -- I've
2  never seen the man before.
3  Q. Did Nadia Costa-Luna get injured at other
4  soccer games?
5  A. I'm sure she did. Do I recall other games?
6  No.
7  Q. But it's your sworn testimony that Dr.
8  Costa-Luna never said anything to you ever at any game
9  before, during, or after about inappropriately touching
10  his daughter?
11  A. Correct.
12  Q. Who was your supervisor at the Brownsville ISD?
13  A. Mr. Zamora.
14  Q. Have you ever attended counseling sessions,
15  whether voluntarily or involuntarily?
16  A. No, ma'am.
17  Q. Did the school district -- the Harlingen School
18  District ever tell you -- ever instruct you on the
19  proper way to treat a female athlete?
20  A. No. I assume that was our job.
21  Q. At any time while you were a trainer for the
22  Harlingen School District, did any school official
23  comment on your touching a female student?
24  A. I would say that coaches would always -- not in
25  relation to an event, but coaches would always --

**Page 121**

1  always ask us, say, "Boy, you know, you need" --
2  "you've got to be careful when there's girls in the
3  room," and, "You've got to be careful how you treat
4  them," and items of that nature. We heard that
5  constantly for the boys and the girls.
6      Did any one person come up to me and say,
7  "You need to be careful with this"? Not that I know
8  of, no.
9  Q. Well, when you say that you were told that
10  generally as a group, is this in response to somebody
11  saying something?
12  A. Not that I know of.
13  Q. In other words, were you ever told by any
14  school official, you know, "Parents are complaining or
15  someone has said something. You need to be careful"?
16  A. No, that was never told to me.
17  Q. How would you treat a female student who had an
18  injury below her clothes -- under her clothes?
19  A. We would, first of all, put them in a -- as a
20  secluded area as we could away from the other students
21  and we would use a towel to drape the area off with
22  and -- and treat them that way or then.
23  Q. And you read in Cindy Espinosa's deposition
24  where -- where one time she had an injury and you
25  tucked her underwear -- or your hand up inside her

Page 162

1  Q. -- were you aware it was prohibited?
2  A. Yes. Yes. Yes. That's everywhere.
3  Q. And you were -- and you were aware that the
4  district prohibited a romantic relationship with
5  students?
6  A. Yes, ma'am.
7  Q. Were you also aware that sexual harassment was
8  prohibited?
9  A. Yes.
10 Q. Were you aware that any type of inappropriate
11 contact, physical contact or other touching of a
12 student was prohibited?
13 A. Yes.
14 Q. Were you aware that any type of offensive
15 language with a student was prohibited?
16 A. Yes.
17 Q. Did you ever try to initiate a romantic
18 relationship with Cynthia Espinosa?
19 A. No, ma'am.
20 Q. Did you ever ask her on a date?
21 A. No, ma'am.
22 Q. You mentioned in your earlier testimony that
23 the policies were constantly updated.
24 A. Yes, ma'am.
25 Q. Are you aware that the policies Ms. Cassidy

Page 163

1  asked you to look at earlier are actually labeled as
2  certain update numbers and that they -- that that
3  policy was in existence before as a different update
4  number?
5  A. I --
6  Q. Let me show you.
7  A. I didn't pay that much attention to it.
8  Q. I believe the first policy she showed you that
9  was Bates labeled D-001 --
10 A. Where is that?
11 Q. -- was district policy --
12     MS. LEEDS: Oh, it's not on here.
13 Q. Yeah. The Bates label isn't on here.
14 A. Oh, okay.
15 Q. You referred to "Student Rights and
16 Responsibilities."
17 A. Oh, yes, ma'am. Yes, ma'am. Yes, ma'am.
18 Q. And you see that policy is District Policy FNCJ
19 (Legal)?
20 A. Oh, okay.
21 Q. And down at the bottom of that policy, do you
22 see that it is Update 61?
23 A. Oh, okay. Yes, ma'am.
24 Q. Are you aware that prior to that policy being
25 in effect, there would have been the same type policy

Page 164

1  but as Update 60, and prior to that Update 59 and prior
2  to that Update 58?
3  A. Correct. Correct.
4     MS. CASSIDY: Objection, calls for a legal
5  conclusion.
6  Q. So the fact that a policy is adopted on a
7  certain date does not mean the same policy or a version
8  of it was not in effect prior to that date?
9  A. Correct.
10 Q. At any time that you worked with Harlingen
11 CISD, did you think that the school district permitted,
12 allowed, or condoned any type of inappropriate contact
13 with a student?
14 A. Oh, I mean, absolutely not.
15    MS. ROBINSON: Pass the witness.
16    EXAMINATION
17 BY MS. CASSIDY:
18 Q. Mr. Brunt, how did you know that the Harlingen
19 School District prohibited you from having a romantic
20 relationship with a student?
21 A. That's kind of common knowledge.
22 Q. From where?
23 A. Other employees.
24 Q. Other employees where?
25 A. At Harlingen CISD.

Page 165

1  Q. So another employee told you that you couldn't
2  have a romantic relationship with a student?
3  A. You know, verbatim told me that, no.
4  Q. Okay.
5  A. And it was --
6  Q. How did you know that Harlingen School District
7  prohibited you from having a romantic relationship with
8  a student?
9  A. There was evidently a lawsuit a few years back
10 about a teacher that was trying to have a romantic or
11 some type of relationship with a student and that topic
12 of conversation came up many times in the coaches'
13 office and it was always, "Well, you know" -- the
14 statement always made was, "That's just" -- "that is
15 absolutely not something that is to be done at" -- "at
16 anytime anywhere. It's just" -- "that's suicide."
17 Q. Okay. Where was the lawsuit?
18 A. I --
19 Q. Well, did it involve the Harlingen School
20 District?
21 A. I don't know. I would think it would be
22 because the Harlingen -- the Harlingen coaching staff
23 knew of it. I don't -- it was either in Harlingen or
24 San Benito. I don't remember.
25 Q. Okay. So what coach told you that it was

42 (Pages 162 to 165)

BRYANT & STINGLEY, INC.

www.bryantstingley.com                    (956) 428-0755

ERRATA SHEET/SIGNATURE PAGE

PAGE LINE    CHANGE                                          REASON

_I cannot recognize anything that needs to be changed_

I, LARRY B. BRUNT, have read the foregoing transcript and hereby affix my signature that same is true and correct, except as noted above.

_____
LARRY B. BRUNT

THE STATE OF TEXAS
COUNTY OF _El Paso_

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority on this the _17th_ day of _January_, 2005.

_____
Notary Public in and for
The State of Texas

BRYANT & STINGLEY, INC.
McAllen           Harlingen           Brownsville
(956)618-2366   (956)428-0755       (956)542-1020
(800)462-0253 (STATEWIDE)

ORIGINAL

BRYANT & STINGLEY, INC.
RECEIVED 1-25-05

TU-3357

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| CYNTHIA ESPINOSA,<br>    Plaintiff | )(<br>)(<br>)( |
| VS. | )(<br>)( |
| HARLINGEN CONSOLIDATED<br>INDEPENDENT SCHOOL<br>DISTRICT AND LARRY B.<br>BRUNT,<br>    Defendants | )(  CIVIL ACTION NO. B-04-052<br>)(<br>)(<br>)(<br>)( |

REPORTER'S CERTIFICATION

I, RHONDA A. MARTIN, Certified Court Reporter, certify that the witness, LARRY B. BRUNT, was duly sworn by me, and that the deposition is a true and correct record of the testimony given by the witness on JANUARY 3, 2005; that the deposition was reported by me in stenograph and was subsequently transcribed by me or under my supervision.

I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, nor am I financially interested in the action.

WITNESS MY HAND on this the *10th* day of *January*, 2005.

*Rhonda Martin by V.J.*
RHONDA A. MARTIN, Texas CSR 4297
Expiration Date:  12-31-05
Bryant & Stingley, Inc.
Firm Registration No. 41
2010 East Harrison
Harlingen, Texas 78550
(956) 428-0755