08:54

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| CYNTHIA ESPINOSA )( | |
|     Plaintiff )( | |
| )( | |
| )( | |
| VS. )( | CIVIL ACTION NO. B-04-052 |
| )( | |
| HARLINGEN CONSOLIDATED )( | |
| INDEPENDENT SCHOOL )( | |
| DISTRICT AND LARRY B. )( | |
| BRUNT )( | |
|     Defendants )( | |

ORAL DEPOSITION OF
JOHN C. LERMA
FEBRUARY 22, 2005

    ORAL DEPOSITION OF JOHN C. LERMA, produced as a witness at the instance of the PLAINTIFF, taken in the above-styled and numbered cause on FEBRUARY 22, 2005, reported by PEGGY BRYANT, Certified Court Reporter No. 1208, in and for the State of Texas, at Harlingen Consolidated Independent School District, J. Gordon Nix Building, 950 East Tyler, Harlingen, Texas, pursuant to the Federal Rules of Civil Procedure.



BRYANT & STINGLEY, INC.
McAllen        Harlingen        Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

## APPEARANCES

COUNSEL FOR PLAINTIFF:

    JANICE A. CASSIDY
    JANICE A. CASSIDY, P.C.
    550 North Sam Houston Street
    San Benito, Texas  78586


COUNSEL FOR DEFENDANT HARLINGEN CONSOLIDATED
INDEPENDENT SCHOOL DISTRICT:

    BRIDGET R. ROBINSON
    WALSH, ANDERSON, BROWN, SCHULZE &
       ALDRIDGE, P.C.
    6300 La Calma, Suite 200
    Austin, Texas  78752


COUNSEL FOR DEFENDANT LARRY B. BRUNT:

    EILEEN M. LEEDS
    WILLETTE & GUERRA, L.L.P.
    1534 East 6th Street, Suite 200
    Brownsville, Texas  78520


ALSO PRESENT:

    Dr. Maria Christina Garcia
    Donna Dahlen

```
                                    14
1  something like that?
2    A. Report it.
3    Q. Okay. To whom?
4    A. To the -- our building principal, Mr. -- which
5  was Mr. Nava.
6    Q. Did you have any supervisory authority over
7  Larry Brunt?
8    A. Well, I was the head coach and athletic
9  coordinator, so I believe, yes, I did have probably
10 some supervisory over Larry, yes.
11   Q. Did you have the ability to fire him?
12   A. No, ma'am.
13   Q. So if he were doing something inappropriate,
14 what would you do about that?
15   A. If he was -- I would call him in and talk to
16 him about it, and if I felt like it was needed to be --
17 serious enough, then I would report it to my immediate
18 supervisor, which would be Mr. Nava, and also our
19 athletic director, which is Mr. Lupe "Chipper" Zamora.
20   Q. Did you ever see any inappropriate conduct by
21 Mr. Brunt?
22   A. No, ma'am.
23   Q. Okay. Did you attend the soccer games, the
24 girls soccer games?
25   A. I attended most of them. I didn't attend all
```

```
                                    15
1  of them, but I attended quite a few of them.
2    Q. And what was your job during -- in what
3  capacity would you attend the soccer game?
4    A. I was there to support the girls soccer program
5  and to support the coaches and the girls there, and I
6  was observing the game in that capacity. I wasn't
7  there as an administrator in charge or anything like
8  that. I was just there to enjoy the game and watch the
9  game and be supportive.
10   Q. Were you there as a supervisor of Mr. Brunt?
11   A. Repeat that, please.
12   Q. Were you there in a supervisory capacity over
13 Mr. Brunt?
14   A. Well, if he was there, assigned there, then,
15 sure, I would -- I would be in that capacity, right.
16   Q. Did you ever watch the way Mr. Brunt handled
17 a -- or treated a female soccer player who was injured?
18   A. Yes, ma'am.
19   Q. Okay. And like what kind of injuries did you
20 see him treat?
21   A. Ankles and knee injuries, shoulder injuries.
22 Those are probably the ones that I observed.
23   Q. And they were during games?
24   A. During games, yes, ma'am.
25   Q. Did you ever see him touch any of the females
```

```
                                    16
1  inappropriately?
2    A. No, ma'am.
3    Q. And where would you be positioned normally if
4  you were attending the games? Would you be down with
5  the trainer, or would you be up in the stands with the
6  fans?
7    A. I'd be up in the stands with the fans.
8    Q. Okay. So how much attention would you be
9  paying to the trainer, I mean, routinely during a game?
10   A. Not -- not a lot. Not a lot.
11   Q. Okay. Routinely was there a requirement that
12 anyone else from the school district attend the games,
13 soccer games?
14   A. Yes, ma'am.
15   Q. Who was required to attend?
16   A. The administrator in charge, and --
17   Q. Who was whom at the time, 1999-2000 season?
18   A. Well, Mr. Nava made those assignments. I think
19 all the assistant principals rotated as far as the
20 assignment is concerned, so there were, you know,
21 several principals at one time or another there.
22   Q. Okay. So what were -- are you saying assistant
23 principals or principals?
24   A. Assistant principals.
25   Q. Okay.
```

```
                                    17
1    A. And Mr. Nava would also assign himself, so it
2  was principal and assistant principals who were usually
3  the administrator in charge at these games.
4    Q. And they were required to attend?
5    A. Yes, ma'am.
6    Q. Okay. So as far as you're concerned, do you
7  have any -- let me ask you this: Do you know if
8  Mr. Brunt was ever reprimanded for any inappropriate
9  behavior while he was at the Harlingen School District?
10   A. No, ma'am.
11   Q. So you have no idea?
12   A. No idea.
13   Q. Okay. Let me show you, Mr. Lerma, what's been
14 marked -- not marked, but what I have received in
15 discovery from the Harlingen School District and it's
16 Bates -- it's Students' Rights and Responsibility,
17 Sexual Harassment, Sexual Abuse, it's entitled, and
18 it's Bates stamped D0001 through D0034. And I'd like
19 you to look at this, if you will.
20   A. Any specific area you want me to look at, or
21 all of it or --
22   Q. Well --
23   A. There's quite a bit of information here.
24   Q. Okay. Mr. Lerma, I guess what I'm asking you
25 is have you ever seen that before?
```

**Page 30**

1  Q. In the training room?
2  A. Not in the training room, in the area.
3  Q. So how often did you go to the training room?
4  A. I wouldn't say maybe on a daily basis, but I
5  went several times during the course of the week, you
6  know, four, five, six times during the course of the
7  week.
8  Q. And what would be going on traditionally or
9  routinely when you went in there?
10  A. Treating athletes, usually, or I would go and
11  check on some of my student athletes during football
12  season, seeing how they were doing. But they were
13  treating their athletes at the time.
14  Q. Were you ever in the training room when he was
15  treating female athletes?
16  A. Yes, ma'am.
17  Q. And was there more than one athlete in there at
18  the time?
19  A. Usually. Usually there were.
20  Q. I guess let me just be clear on something,
21  Mr. Lerma. Were you ever told that it was your job to
22  make sure that the trainers didn't do anything
23  appropriate -- inappropriate -- excuse me -- with the
24  students?
25  A. Let me say this: That I had in-services myself

**Page 31**

1  with my fellow coaches, but I don't know if the
2  trainers were there or not. I can't remember, which I
3  told them to -- you know, we talked a little bit about
4  sexual harassment and to be careful and not to be
5  hugging, not to be touching any -- people of the
6  opposite sex and be careful and be professional in our
7  endeavors and things like that, yes.
8  Q. Did you ever -- so you don't recall if
9  Mr. Brunt ever attended that --
10  A. I don't remember. I really don't remember.
11  Q. Okay. Mr. -- you may know this from his
12  deposition. Mr. Brunt says he doesn't recall attending
13  any courses --
14  A. Uh-huh.
15  Q. -- on sexual harassment during his employment.
16  Were you told that?
17  A. No, ma'am.
18  Q. But he did remember coaches standing around.
19  So is that what you're referring to?
20      MS. ROBINSON: Objection, form.
21  A. What do you mean?
22  Q. Okay. In other words, he sort of remembered
23  comments -- well, never mind. I take back the
24  question.
25      So you don't recall if Mr. Brunt was ever

**Page 32**

1  at one of your in-services where you said no
2  inappropriate touching or no hugging?
3  A. No, I'm not sure, ma'am.
4  Q. Okay. Let me ask you about that, Mr. Lerma.
5  What about hugging? I mean, it's a Valley thing, is it
6  not?
7  A. Sure.
8  Q. Okay. So what did you tell your coaches?
9  A. Well, I just told them to be careful when
10  they -- around male -- and I'm talking about our male
11  coaches and so forth, to be -- be on the guard of -- to
12  be careful where the situation can be interpreted as,
13  you know, something close to sexual harassment, and
14  just told them to be professional in -- in their
15  dealings with the students and so forth at all times.
16  And -- and also talked to them about their languages
17  and so forth, not to use any foul language anywhere or
18  whatever, things like that.
19      So these were just kind of little
20  reminders and things like that. But our basically
21  in-services that we got on sexual harassment --
22  harassment was through Mr. Sosa, and it was a very
23  thorough sexual harassment in-service. I remember
24  that.
25      And we had that every year, and it was --

**Page 33**

1  all the coaches were there, the faculty was there, so
2  we're all very familiar with the sexual harassment
3  policies by the -- by the district.
4  Q. And was the training geared towards protecting
5  the teachers? In other words, don't get accused of
6  something, or protecting the students?
7  A. It was protecting both, students and teachers,
8  you know, to be aware of situations where it could
9  occur not only to teachers, but also to students, and
10  it was our obligation to report anything that we saw.
11  Q. Did you have that same kind of reminder? Did
12  you give those same reminders to Heather?
13  A. I believe so.
14  Q. So did you ever see Mr. Brunt hugging his
15  athletes?
16  A. No, ma'am.
17  Q. So you were at games and you never saw that?
18  A. No, ma'am, never did.
19  Q. And you were in the training room and you never
20  saw that?
21  A. No. No, ma'am.
22  Q. Is there any school policy against a male
23  teacher or coach or trainer not being alone with a
24  female student?
25  A. I'm not aware of one, no, ma'am.

```
 1                    ERRATA SHEET/SIGNATURE PAGE

 2      PAGE LINE   CHANGE                                    REASON

 3              _____

 4              _____

 5              _____

 6              _____

 7              _____

 8              _____

 9              _____

10              _____

11              _____

12              _____

13              _____

14          I, JOHN C. LERMA, have read the foregoing transcript
        and hereby affix my signature that same is true and
15      correct, except as noted above.

16                                    _____
                                              JOHN C. LERMA
17

18      THE STATE OF TEXAS

19      COUNTY OF   Cameron

20              SUBSCRIBED AND SWORN TO BEFORE ME, the

21      undersigned authority on this the   6th   day of

22      April                  , 2005.

23          [Notary seal: JULIE DELGADILLO, Notary Public, State of Texas,
                          My Commission Expires 03-29-2009]

24                                    _____
                                      Notary Public in and for
25                                    The State of Texas
```

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | |
|---|---|
| CYNTHIA ESPINOSA )( | |
| Plaintiff )( | |
| )( | |
| )( | |
| VS. )( | CIVIL ACTION NO. B-04-052 |
| )( | |
| HARLINGEN CONSOLIDATED )( | |
| INDEPENDENT SCHOOL )( | |
| DISTRICT AND LARRY B. )( | |
| BRUNT )( | |
| Defendants )( | |

REPORTER'S CERTIFICATE TO THE ORAL DEPOSITION
OF JOHN C. LERMA
TAKEN FEBRUARY 22, 2005

I, PEGGY BRYANT, Certified Court Reporter No. 1208 in and for the State of Texas, certify that the witness, JOHN C. LERMA, was duly sworn by me, and that the deposition is a true and correct record of the testimony given by the witness on FEBRUARY 22, 2005; that the deposition was reported by me in stenograph and was subsequently transcribed under my supervision.

I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, nor am I financially interested in the action.

BRYANT & STINGLEY, INC.
McAllen          Harlingen          Brownsville
(956)618-2366   (956)428-0755   (956)542-1020

WITNESS MY HAND on this the  9th  day of  March , 2005.

*Peggy Bryant* by Y.J.
PEGGY BRYANT, CSR NO. 1208
Expiration Date: 12/31/06
Firm Registration No. 41
Bryant & Stingley, Inc.
2010 East Harrison
Harlingen Texas 78501
956-428-0755